PROKURATURA OKRĘGOWA
ul. Reymonta 24
45-954 OPOLE, tel. 077 454-20-74

Opole, dnia 27 lipca 2015 roku

Sygnatura akt VI Ds.15/14

(poprzednio VDs.10/05)

Informacja uzupełniająca do wniosku z dnia 8 lipca 2013 roku

o tymczasowe aresztowanie i ekstradycję Adama Kazimierza Antonowicza

W związku z wejściem w życie z dniem 1 lipca 2015 roku ustawy z dnia 20 lutego 2015 roku o zmianie ustawy - Kodeks karny oraz niektórych innych ustaw, zmieniającej przepisy o przedawnieniu informuję, że w dniu 17 sierpnia 2013 roku przedawnieniu uległ zarzucany podejrzanemu Adamowi Kazimierzowi Antonowiczowi czyn z artykułu 3 paragraf 1 Ustawy z dnia 12 października 1994 roku o ochronie obrotu gospodarczego i zmianie niektórych przepisów prawa karnego w związku z artykułem 265 paragraf 1 Ustawy z dnia 19 kwietnia 1969 roku Kodeks Karny przy zastosowaniu artykułu 10 paragraf 2 Ustawy z dnia 19 kwietnia 1969 roku Kodeks Karny i artykułu 58 paragraf 1 Ustawy z dnia 19 kwietnia 1969 roku Kodeks Karny w związku z artykułem 4 paragraf 1 Ustawy z dnia 19 kwietnia 1969 roku Kodeks Karny.

Informuje również, że drugi z zarzutów stawianych podejrzanemu Adamowi Antonowiczowi z artykułu 272 kodeksu karnego w związku z artykułem 233 paragraf 6 w związku z paragrafem 1 kodeksu karnego i artykułu 270 paragraf 1 kodeksu karnego przy zastosowaniu artykułu 11 paragraf 2 kodeksu karnego w związku z artykułem 12 kodeksu karnego przedawni się w dniu 16 października 2024 roku, natomiast zarzut III z artykułu 13 paragraf 1 kodeksu karnego w związku z artykułem 272 kodeksu karnego w związku z artykułem 273 kodeksu karnego i artykułem 233 paragraf 6 w związku z paragrafem 1 kodeksu karnego i artykułem 270 paragraf 1 kodeksu karnego przy zastosowaniu artykułu 11 paragraf 2 kodeksu karnego przedawni się w dacie 20 października 2024 roku.



Prokurator Okręgowy

w Opolu

Włodzimierz Ostrowski

**· Certified translation from Polish**

---

*Oblong stamp:*
Prokuratura Okręgowa [Circle Prosecution Office]
Ul. Reymonta 24
45-954 Opole, tel. 077 454-20-74

Opole, 27 July 2015

File number VI Ds. 15/14
(previously V Ds. 10/05)

### Supplementary information to the request of 8 July 2013 for pre-trial detention and extradition of Adam Kazimierz Antonowicz

In connection with the entry into force on 1 July 2015 of the Act of 20 February 2015 amending the Act - Criminal Code and some other laws, amending the statute of limitations I would like to inform you that on 17 August 2013 became prescribed the offense under Article 3 paragraph 1 of the Act of 12 October 1994 on the protection of business transactions and the amendment of certain provisions of criminal law in connection with Article 265 paragraph 1 of the Act of 19 April 1969 Criminal Code with application of Article 10 paragraph 2 of the Act of 19 April 1969 Criminal Code and article 58 paragraph 1 of the Act of 19 April 1969 Criminal Code in connection with article 4 paragraph 1 of the Act of 19 April 1969 Criminal Code, of which Adam Kazimierz Antonowicz was accused.

I would also like to inform you that the other of charges against the suspect Adam Antonowiczowi under Article 272 of the Criminal Code in connection with Article 233 paragraph 6 in relation to paragraph 1 of the Criminal Code and Article 270 paragraph 1 of the Criminal Code with the application of Article 11 paragraph 2 of the Criminal Code in relation to Article 12 of the Criminal Code will become prescribed on 16 October 2024, while the third charge under Article 13 paragraph 1 of the Criminal Code in relation to Article 272 of the Criminal Code in relation to article 273 of the Criminal Code and Article 233 paragraph 6 in relation to paragraph 1 of the Criminal Code and Article 270 paragraph 1 of the Criminal Code with the application of Article 11 paragraph 2 of the Criminal Code will become prescribed on 20 October 2024.

Circle Prosecutor
In Opole
Włodzimierz Ostrowski
*(-) illegible signature*

*Round official stamp with the national emblem of the Republic of Poland inside, and the following circumscription*: Prokuratura Okręgowa [Circle Prosecution Office] in Opole *2*

---

**Rep. No. 490/15**

*I, the undersigned dr. Marek Kamiński, sworn translator of the English language, recorded on the list of sworn translators of the Minister of Justice under No. TP/2022/05, do hereby certify that the foregoing translation is in conformity with the original document in Polish.*

*Warsaw, 12 August 2015*



PROKURATURA OKRĘGOWA
ul. Reymonta 24
45-954 OPOLE, tel. 077 454-20-74

Opole, dnia 6 lipca 2015 roku

Sygnatura akt VI Ds.15/14

(poprzednio VDs.10/05)

Informacja uzupełniająca do wniosku z dnia 8 lipca 2013 roku

o tymczasowe aresztowanie i ekstradycję Adama Kazimierza Antonowicza

W związku z wejściem w życie z dniem 1 lipca 2015 roku ustawy z dnia 20 lutego 2015 roku o zmianie ustawy - Kodeks karny oraz niektórych innych ustaw, zmieniającej przepisy o przedawnieniu informuję, że przedawnieniu uległ zarzucany podejrzanemu Adamowi Kazimierzowi Antonowiczowi czyn z artykułu 3 paragraf 1 Ustawy z dnia 12 października 1994 roku o ochronie obrotu gospodarczego i zmianie niektórych przepisów prawa karnego w związku z artykułem 265 paragraf 1 Ustawy z dnia 19 kwietnia 1969 roku Kodeks Karny przy zastosowaniu artykułu 10 paragraf 2 Ustawy z dnia 19 kwietnia 1969 roku Kodeks Karny i artykułu 58 paragraf 1 Ustawy z dnia 19 kwietnia 1969 roku Kodeks Karny w związku z artykułem 4 paragraf 1 Ustawy z dnia 19 kwietnia 1969 roku Kodeks Karny.

Podtrzymuję równocześnie wniosek o tymczasowe aresztowanie i ekstradycję Adama Antonowicza w zakresie pozostałych zarzutów stawianych podejrzanemu.





Prokurator Okręgowy

w Opolu

Włodzimierz Ostrowski

mgr Katarzyna Bartkowiak

Certified translator of English

*Certified translation from Polish into English, from original document*

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

[*Oblong stamp*]
DISTRICT PROSECUTOR'S OFFICE
ul Reymonta 24
45-954 OPOLE, tel. 077 454-20-74

Opole, 6 July 2015

Case file no. VI Ds. 15/14
(former case file no. VDs.10/05)

Supplementary Information to Request of 8 July 2013 for Temporary Detention
and Extradition of Adam Kazimierz Antonowicz

I would like to respectfully inform you that pursuant to the Act of 20 February 2015 amending the Criminal Cod Act and Certain Other Acts, which Act entered into force on 1 July 2015, the act with which suspect Adam Kazimierz Antonowicz was charged fell under the statute of limitations, that is the act specified in Article 3 Paragraph 1 of the Act of 12 October 1994 on Trade Protection and Amending Certain Provisions of Criminal Law in relation to Article 265 Paragraph 1 of the Criminal Code Act of 19 April 1969 with the application of Article 10 Paragraph 2 of the Criminal Cod Act of 19 April 1969 and Article 58 Paragraph 1 of the Criminal Cod Act of 19 April 1969 in relation to Article 4 Paragraph 1 of the Criminal Cod Act of 19 April 1969.

At the same time, I would like to uphold the request for the temporary detention and extradition of Adam Antonowicz on the grounds of the remaining charges presented to the said suspect.

[*Round stamp with the national emblem
of the Republic of Poland in the centre
and the following circumscription:
DISTRICT PROSECUTOR'S OFFICE
in OPOLE \*2\*.*]

**District Prosecutor in Opole**

[*(-) Illegible signature*]

**Włodzimierz Ostrowski**

---

*I, the undersigned Katarzyna Bartkowiak, a sworn translator of English, recorded on the list of sworn translators kept by Minister of Justice under no. TP/201/14, do hereby certify and attest the above to be an accurate and complete translation of the original of the Polish document presented to me.*

Repertory no. 74/**2015**

Warsaw, 17 July 2015

mgr Katarzyna Bartkowiak



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## EXHIBIT B



**RZECZPOSPOLITA POLSKA
MINISTER SPRAWIEDLIWOŚCI**

DWM PC II 073 – *300/13*

Warszawa, dnia 23.07. 2013 roku

**Pan
John Kerry**

**Sekretarz Stanu
Stanów Zjednoczonych Ameryki**

W oparciu o treść artykułu 1, artykułu 2 ustęp 1 i 2 oraz artykułu 12 Umowy między Rzecząpospolitą Polską a Stanami Zjednoczonymi Ameryki o ekstradycji z dnia 10 lipca 1996 roku a także w oparciu o treść artykułu 5 ustęp 2 Umowy między Unią Europejską a Stanami Zjednoczonymi Ameryki o ekstradycji z dnia 25 czerwca 2003 roku, uprzejmie przesyłam wniosek Prokuratora Okręgowego w Opolu z dnia 8 lipca 2013 roku, sygnatura V Ds. 10/05, o tymczasowe aresztowanie i ekstradycję obywatela polskiego Adama Kazimierza Antonowicza, podejrzanego o popełnienie przestępstw polegających na przedłożeniu fałszywych i stwierdzających nieprawdę dokumentów w celu uzyskania kredytów a także o przestępstwo podstępnego wprowadzenia w błąd funkcjonariusza publicznego, sfałszowania dokumentu i wyłudzenia paszportu, w którym poświadczono nieprawdę co do tożsamości posiadacza paszportu.

Przesyłam również w załączeniu wszystkie dokumenty wymagane do przedłożenia z wnioskiem.

– 2 –

Podzielając stanowisko wyrażone we wniosku proszę o jego pozytywne rozpatrzenie.

Sprawa Adama Kazimierza Antonowicza, zarejestrowana jest w nadzorującej postępowanie ekstradycyjne Prokuraturze Generalnej Rzeczypospolitej Polskiej pod sygnaturą - PG V $Oz_1$ 825/13, proszę zatem władze Stanów Zjednoczonych Ameryki o kierowanie dalszej korespondencji dotyczącej niniejszego wniosku do tego organu.

z upoważnienia
MINISTRA SPRAWIEDLIWOŚCI

Wojciech Hajduk
PODSEKRETARZ STANU

**PROKURATURA OKRĘGOWA**
ul. Reymonta 24
45-954 OPOLE, tel. 077 454-20-74

Opole, dnia 8 lipca 2013 roku

Sygnatura akt V Ds. 10/05

Wniosek

o tymczasowe aresztowanie i ekstradycję

Zwracam się z prośbą o tymczasowe aresztowanie i ekstradycję:

**Adama Kazimierza Antonowicza (Antonowicz)**



syna ████████ i ████████████████████

urodzonego ████████████ w ████

obywatela Rzeczypospolitej Polskiej

ostatnio zamieszkałego w ████ przy ulicy ████████ 18/9

Pesel ████████899

legitymującego się dowodem osobistym o serii ██ i numerze ██062 wydanym

przez ████████████████.

występującego z obrońcą z wyboru adwokatem Wojciechem Solarewiczem z Kancelarii Adwokackiej z siedzibą w Brzegu przy ul. Piastowskiej 14

Materiał dowodowy zebrany w sprawie o sygnaturze akt V Ds. 10/05 prowadzonej przez Prokuraturę Okręgową w Opolu pozwolił na wydanie postanowienia o przedstawieniu zarzutów Adamowi Antonowiczowi o to, że:

I. W okresie od dnia 27 kwietnia 1998 roku do dnia 17 sierpnia 1998 roku w Brzegu, wspólnie i w porozumieniu z innymi osobami, w celu uzyskania z Banku Zachodniego Spółka Akcyjna we Wrocławiu Oddział w Namysłowie dla siebie oraz innych osób kredytów bankowych przeznaczonych na zakup w systemie sprzedaży ratalnej w Firmie Handlowo - Usługowej Biuro Podróży PTTK  z siedzibą w Brzegu, którego był

pełnomocnikiem, imprez turystycznych za granicą oraz na terenie kraju, przedkładał za pośrednictwem K████ N████████ - właściciela firmy KLN Pośrednictwo Kredytowe z siedzibą w Kluczborku w wyżej wymienionym banku nierzetelne, oraz podrobione dokumenty mające istotne znaczenie dla uzyskania kredytów, działając na szkodę Banku Zachodniego Spółka Akcyjna Oddział w Namysłowie i tak:

1. W dniu 27 kwietnia 1998 roku w Brzegu w celu uzyskania przez K████ D████ kredytu bankowego w wysokości 4.000 złotych, przeznaczonego na zakup w systemie sprzedaży ratalnej w Firmie Handlowo - Usługowej Biuro Podróży PTTK z siedzibą w Brzegu 2 - tygodniowych wczasów w Zakopanem, przedłożył za pośrednictwem K████ N████████ - właściciela firmy KLN Pośrednictwo Kredytowe z siedzibą w Kluczborku w wyżej wymienionym banku nierzetelne dokumenty na nazwisko K████ D████ dotyczące okoliczności mających istotne znaczenie dla uzyskania przez nią kredytu w postaci:

> wniosku z dnia 27 kwietnia 1998 roku o udzielenie kredytu na zakup ratalny usługi w postaci 2 tygodniowych wczasów w Zakopanem, w kwocie 4.000 złotych w Firmie Handlowo - Usługowej Biuro Podróży PTTK z siedzibą w Brzegu,

> umowy kredytowej z dnia 27 kwietnia 1998 roku zawartej przez Bank Zachodni Spółka Akcyjna Oddział w Namysłowie z kredytobiorcą K████ D████ na zakup w systemie sprzedaży ratalnej usługi w postaci 2 - tygodniowych wczasów w Zakopanem o wartości 4200 złotych,

> rachunku uproszczonego o numerze 11/IV/98 z dnia 27 kwietnia 1998 roku wystawionego przez Firmę Handlowo - Usługową Biuro Podróży PTTK z siedzibą w Brzegu dla K████ D████, dokumentującego zakup 2-tygodniowych wczasów w Zakopanem dla czterech osób o wartości 4200 złotych

które zawierały nieprawdziwe informacje odnośnie przeznaczenia kredytu, ponieważ kredytowana usługa w rzeczywistości nie miała miejsca, oraz wobec faktu, iż w wyżej wymienionej firmie wystawiono inny rachunek o tym samym numerze z datą 1 kwietnia 1998 roku na nazwisko A███ Z███, dokumentujący zakup usługi w postaci wycieczki na Litwę o wartości 300 złotych,

**2**. W dniu 6 maja 1998 roku w Brzegu, w celu uzyskania przez siebie kredytu bankowego w wysokości 3.500 złotych, przeznaczonego na zakup w systemie sprzedaży ratalnej w Firmie Handlowo - Usługowej Biuro Podróży PTTK z siedzibą w Brzegu 2 - tygodniowych wczasów w Tunezji, przedłożył w wyżej wymienionym banku, za pośrednictwem K█████ N████████ - właściciela firmy KLN Pośrednictwo Kredytowe z siedzibą w Kluczborku nierzetelne dokumenty dotyczące okoliczności mających istotne znaczenie dla uzyskania kredytu w postaci:

> ➢ wniosku z dnia 5 maja 1998 roku o przyznanie kredytu w kwocie 3.500 złotych, na zakup w systemie sprzedaży ratalnej usługi w postaci 2 - tygodniowych wczasów w Tunezji w Firmie Handlowo - Usługowej Biuro Podróży PTTK z siedzibą w Brzegu,

> ➢ rachunku uproszczonego o numerze 19/V/98 z dnia 27 kwietnia 1998 roku wystawionego przez Firmę Handlowo - Usługową Biuro Podróży PTTK z siedzibą w Brzegu, dokumentującego fikcyjny zakup przez Adama Antonowicza 2-tygodniowych wczasów w Tunezji, o wartości 3.568 złotych,

> ➢ umowy kredytowej z dnia 6 maja 1998 roku, zawartej przez Bank Zachodni Spółka Akcyjna Oddział w Namysłowie z kredytobiorcą Adamem Antonowiczem, na zakup w systemie sprzedaży ratalnej usługi w postaci 2 - tygodniowych wczasów w Tunezji dla dwóch osób w kwocie 3.500 złotych,

które to dokumenty zawierały nieprawdziwe informacje odnośnie przeznaczenia kredytu, ponieważ kredytowana usługa w rzeczywistości nie miała miejsca, oraz

> ➢ poświadczającego nieprawdę zaświadczenia z dnia 30 kwietnia 1998 roku o zatrudnieniu i zarobkach Adama Antonowicza w Polskim Towarzystwie Turystyczno - Krajoznawczym Oddział Ziemi Brzeskiej, na którym inna osoba podrobiła podpis Prezesa Oddziału - W█████ B████████, podczas gdy w rzeczywistości nie był on zatrudniony w tej instytucji,

3. W dniu 20 lipca 1998 roku w Brzegu, w celu uzyskania przez Elżbietę Bojanowską kredytu bankowego w wysokości 9.000 złotych, przeznaczonego na zakup w systemie sprzedaży ratalnej w Firmie Handlowo - Usługowej Biuro Podróży PTTK  z siedzibą w Brzegu 2 - tygodniowych wczasów w Tajlandii, przedłożył, za pośrednictwem K█████ N████████ - właściciela firmy KLN Pośrednictwo Kredytowe z

siedzibą w Kluczborku w wyżej wymienionym banku nierzetelne dokumenty na nazwisko Elżbiety Bojanowskiej, dotyczące okoliczności mających istotne znaczenie dla uzyskania przez nią kredytu w postaci:

> wniosku z dnia 17 lipca 1998 roku o udzielenie E██████ B████████ kredytu w kwocie 9.000 złotych na zakup w systemie sprzedaży ratalnej usługi w postaci 2 tygodniowych wczasów w Tajlandii, w Firmie Handlowo - Usługowej Biuro Podróży PTTK z siedzibą w Brzegu,

> rachunku uproszczonego o numerze 9/VII/98 z dnia 17 lipca 1998 roku, wystawionego przez Firmę Handlowo - Usługową Biuro Podróży PTTK z siedzibą w Brzegu, dokumentującego fikcyjny zakup przez E██████ B████████ 2-tygodniowych wczasów w Tajlandii, o wartości 10.631,16 zł złotych,

> umowy kredytowej z dnia 20 lipca 1998 roku, zawartej przez Bank Zachodni Spółka Akcyjna Oddział w Namysłowie z kredytobiorcą E██████ B████████ na zakup w systemie sprzedaży ratalnej usługi w postaci 2 tygodniowych wczasów w Tajlandii, w kwocie 9.000 złotych,

które to dokumenty zawierały nieprawdziwe informacje odnośnie przeznaczenia kredytu, ponieważ kredytowana usługa w rzeczywistości nie miała miejsca,

**4.** W dniu 4 sierpnia 1998 roku w Brzegu, działając w celu uzyskania przez P██████ M████████ kredytu bankowego w wysokości 2.000 złotych, przeznaczonego na zakup w systemie sprzedaży ratalnej, w Firmie Handlowo - Usługowej Biuro Podróży PTTK z siedzibą w Brzegu 2 - tygodniowych wczasów w Hiszpanii, przedłożył, za pośrednictwem K████████ N████████ - właściciela firmy KLN Pośrednictwo Kredytowe z siedzibą w Kluczborku w wyżej wymienionym banku nierzetelne dokumenty na nazwisko P██████ M████████ dotyczące okoliczności mających istotne znaczenie dla uzyskania przez P██████ M████████ kredytu w postaci:

> wniosku z dnia 28 lipca 1998 roku o udzielenie P██████ M████████ kredytu w kwocie 2.000 złotych na zakup w systemie sprzedaży ratalnej usługi w postaci wczasów w Hiszpanii, w Firmie Handlowo - Usługowej Biuro Podróży PTTK z siedzibą w Brzegu,

➢ rachunku uproszczonego o numerze 98/VII/98 z dnia 28 lipca 1998 roku, wystawionego przez Firmę Handlowo - Usługową Biuro Podróży PTTK z siedzibą w Brzegu, dokumentującego fikcyjny zakup przez Pawła Marszałka 2-tygodniowych wczasów w Hiszpanii, dla dwóch osób o wartości 2.500 złotych

➢ umowy kredytowej z dnia 4 sierpnia 1998 roku, zawartej przez Bank Zachodni Spółka Akcyjna Oddział w Namysłowie z kredytobiorcą P████ M████████ na zakup w systemie sprzedaży ratalnej usługi w postaci 2 tygodniowych wczasów w Hiszpanii w kwocie 2.000 złotych,

które to dokumenty zawierały nieprawdziwe informacje odnośnie przeznaczenia kredytu, ponieważ kredytowana usługa w rzeczywistości nie miała miejsca,

**5**. W dniu 4 sierpnia 1998 roku w Brzegu, działając w celu uzyskania przez J████ K████████ kredytu bankowego o wysokości 10.000 złotych, przeznaczonego na zakup w systemie sprzedaży ratalnej w Firmie Handlowo - Usługowej Biuro Podróży PTTK z siedzibą w Brzegu 2 - tygodniowych wczasów na Majorce, przedłożył, za pośrednictwem K████████ N████████ - właściciela firmy KLN Pośrednictwo Kredytowe z siedzibą w Kluczborku w wyżej wymienionym banku nierzetelne dokumenty na nazwisko Jadwigi Koniecznej dotyczące okoliczności mających istotne znaczenie dla uzyskania przez w/w kredytu w postaci:

➢ wniosku z dnia 3 sierpnia 1998 roku o udzielenie J████████ K████████ kredytu w kwocie 10.000 złotych na zakup w systemie sprzedaży ratalnej usługi w postaci 2 - tygodniowych wczasów na Majorce, w Firmie Handlowo - Usługowej Biuro Podróży PTTK z siedzibą w Brzegu,

➢ rachunku uproszczonego o numerze 101/VII/98 z dnia 31 lipca 1998 roku, wystawionego przez Firmę Handlowo - Usługową Biuro Podróży PTTK z siedzibą w Brzegu, dokumentującego fikcyjny zakup przez J████████ K████████ 2-tygodniowych wczasów na Majorce, dla czterech osób o wartości 11.176, 36 złotych,

➢ umowy kredytowej z dnia 4 sierpnia 1998 roku, zawartej przez Bank Zachodni Spółka Akcyjna Oddział w Namysłowie z kredytobiorcą J████████ K████████ na zakup w systemie sprzedaży ratalnej usługi w postaci 2 - tygodniowych wczasów na Majorce w kwocie 10.000 złotych,

które to dokumenty zawierały nieprawdziwe informacje odnośnie przeznaczenia kredytu, ponieważ kredytowana usługa w rzeczywistości nie miała miejsca,

**6.** W dniu 7 sierpnia 1998 roku w Brzegu, działając w celu uzyskania przez H█████ A█████████ kredytu bankowego w wysokości 10.000 złotych, przeznaczonego na zakup w systemie sprzedaży ratalnej w Firmie Handlowo - Usługowej Biuro Podróży PTTK z siedzibą w Brzegu 2 - tygodniowych wczasów na Teneryfie przedłożył, za pośrednictwem K█████ N█████████ - właściciela firmy KLN Pośrednictwo Kredytowe z siedzibą w Kluczborku w wyżej wymienionym banku nierzetelne dokumenty na nazwisko H███ A█████████, dotyczące okoliczności mających istotne znaczenie dla uzyskania kredytu w postaci:

➢ wniosku z dnia 6 sierpnia 1998 roku o udzielenie H███ A█████████ kredytu w kwocie 10 000 złotych na zakup w systemie sprzedaży ratalnej usługi w postaci 2 - tygodniowych wczasów na Teneryfie w Firmie Handlowo - Usługowej Biuro Podróży PTTK z siedzibą w Brzegu,

➢ rachunku uproszczonego o numerze 109/VIII/98 z dnia 6 sierpnia 1998 roku wystawionego przez Firmę Handlowo - Usługową Biuro Podróży PTTK z siedzibą w Brzegu, dokumentującego fikcyjny zakup przez H███ A█████████ 2-tygodniowych wczasów na Teneryfie, dla trzech osób o wartości 10.797 złotych,

➢ umowy kredytowej z dnia 7 sierpnia 1998 roku, zawartej przez Bank Zachodni Spółka Akcyjna  Oddział w Namysłowie z kredytobiorcą H███ A█████████, na zakup w systemie sprzedaży ratalnej usługi w postaci 2 - tygodniowych wczasów na Teneryfie w kwocie 10.000 złotych,

➢ zaświadczenia z dnia 6 sierpnia 1998 roku o zatrudnieniu i zarobkach H███ A█████████ w Polskim Towarzystwie Turystyczno - Krajoznawczym Oddział Ziemi Brzeskiej, na którym inna osoba podrobiła podpis Prezesa Oddziału - Wilhelmy Barańskiej,

które to dokumenty zawierały nieprawdziwe informacje odnośnie przeznaczenia kredytu, ponieważ kredytowana usługa w rzeczywistości nie miała miejsca,

**7.** W dniu 10 sierpnia 1998 roku w Brzegu, działając w celu uzyskania przez W██████ B██████ kredytu bankowego w wysokości 2.400 złotych, przeznaczonego na zakup w systemie sprzedaży ratalnej w Firmie Handlowo - Usługowej Biuro Podróży PTTK z siedzibą w Brzegu 2 - tygodniowych wczasów na Cyprze przedłożył, za pośrednictwem K██████ N██████ - właściciela firmy KLN Pośrednictwo Kredytowe z siedzibą w Kluczborku w wyżej wymienionym banku nierzetelne dokumenty na nazwisko W██████ B██████, dotyczące okoliczności mających istotne znaczenie dla uzyskania przez nią kredytu w postaci:

➢ wniosku z dnia 7 sierpnia 1998 roku o udzielenie W██████ B██████ kredytu w kwocie 2.400 złotych na zakup w systemie sprzedaży ratalnej usługi w postaci 2 - tygodniowych wczasów na Cyprze, w Firmie Handlowo - Usługową Biuro Podróży PTTK z siedzibą w Brzegu,

➢ rachunku uproszczonego o numerze 112/VIII/98 z dnia 7 sierpnia 1998 roku, wystawionego przez Firmę Handlowo - Usługowej Biuro Podróży PTTK z siedzibą w Brzegu, dokumentującego fikcyjny zakup przez W██████ B██████ 2 - tygodniowych wczasów na Cyprze, o wartości 4.576,00 złotych,

➢ umowy kredytowej z dnia 10 sierpnia 1998 roku, zawartej przez Bank Zachodni Spółka Akcyjna Oddział w Namysłowie z kredytobiorcą W██████ B██████, na zakup w systemie sprzedaży ratalnej usługi w postaci 2-tygodniowych wczasów na Cyprze w kwocie 2.400 złotych,

➢ poświadczającego nieprawdę zaświadczenia z dnia 6 sierpnia 1998 roku o zarobkach W██████ B██████ w Polskim Towarzystwie Turystyczno - Krajoznawczym Oddział Ziemi Brzeskiej, na którym inna osoba podrobiła podpis skarbnika - W██████ C██████,

które to dokumenty zawierały nieprawdziwe informacje odnośnie przeznaczenia kredytu, ponieważ kredytowana usługa w rzeczywistości nie miała miejsca,

8. W dniu 13 sierpnia 1998 roku w Brzegu, działając w celu uzyskania przez B██ K██████ kredytu bankowego w wysokości 3.700 złotych, przeznaczonego na zakup w systemie sprzedaży ratalnej w Firmie Handlowo - Usługowej Biuro Podróży PTTK z siedzibą w Brzegu 2 - tygodniowych wczasów Grecji — Halkidiki, przedłożył, za pośrednictwem K██████ N██████ - właściciela firmy KLN Pośrednictwo

Kredytowe z siedzibą w Kluczborku w wyżej wymienionym banku nierzetelne dokumenty na nazwisko E█ K█████, dotyczące okoliczności mających istotne znaczenie dla uzyskania przez nią kredytu w postaci:

➢ wniosku z dnia 12 sierpnia 1998 roku o udzielenie E█ K█████ kredytu w kocie 3.700 złotych na zakup w systemie sprzedaży ratalnej usługi w postaci 2 - tygodniowych wczasów w Grecji – Halkidiki w Firmie Handlowo - Usługowej Biuro Podróży PTTK z siedzibą w Brzegu,

➢ rachunku uproszczonego o numerze 113/VIII/98 z dnia 11 sierpnia 1998 roku, wystawionego przez Firmę Handlowo - Usługową Biuro Podróży PTTK z siedzibą w Brzegu, dokumentującego fikcyjny zakup przez E█ K█████ 2- tygodniowych wczasów w Grecji - Halkidiki,  o wartości 4256,80 złotych,

➢ umowy kredytowej z dnia 13 sierpnia 1998 roku, zawartej przez Bank Zachodni Spółka Akcyjna Oddział w Namysłowie z kredytobiorcą E█ K█████, na zakup w systemie sprzedaży ratalnej usługi w postaci 2-tygodniowych wczasów w Grecji - Halkidiki, w kwocie 3.700 złotych,

które to dokumenty zawierały nieprawdziwe informacje odnośnie przeznaczenia kredytu, ponieważ kredytowana usługa w rzeczywistości nie miała miejsca

**9.** W dniu 13 sierpnia 1998 roku w Brzegu, działając w celu uzyskania przez M█ K█████ kredytu bankowego w wysokości 10.000 złotych, przeznaczonego na zakup w systemie sprzedaży ratalnej w Firmie Handlowo - Usługowej Biuro Podróży PTTK z siedzibą w Brzegu 2 - tygodniowych wczasów na Malcie, przedłożył, za pośrednictwem K█████ N█████ - właściciela firmy KLN Pośrednictwo Kredytowe z siedzibą w Kluczborku w wyżej wymienionym banku nierzetelne dokumenty na nazwisko M█ K█████, dotyczące okoliczności mających istotne znaczenie dla uzyskania przez niego kredytu w postaci:

➢ wniosku z dnia 12 sierpnia 1998 roku o udzielenie M█ K█████ kredytu w kwocie 10.000 złotych na zakup w systemie sprzedaży ratalnej usługi w postaci 2 - tygodniowych wczasów na Malcie, w Firmie Handlowo - Usługowej Biuro Podróży PTTK z siedzibą w Brzegu,

➢ rachunku uproszczonego o numerze 115/VIII/98 z dnia 11 sierpnia 1998 roku, wystawionego przez Firmę Handlowo - Usługową Biuro Podróży PTTK z

siedzibą w Brzegu, dokumentującego fikcyjny zakup przez M█████ K█████████ 2-tygodniowych wczasów na Malcie o wartości 10.890,46 złotych ,

➤ umowy kredytowej z dnia 13 sierpnia 1998 roku, zawartej przez Bank Zachodni Spółka Akcyjna Oddział w Namysłowie z kredytobiorcą M█████ K█████████, na zakup w systemie sprzedaży ratalnej usługi w postaci 2-tygodniowych wczasów na Malcie, w kwocie 10.000 złotych,

które to dokumenty zawierały nieprawdziwe informacje odnośnie przeznaczenia kredytu, ponieważ kredytowana usługa w rzeczywistości nie miała miejsca,

**10.** W dniu 17 sierpnia 1998 roku w Brzegu, działając w celu uzyskania przez A█████ R█████████ kredytu bankowego w wysokości 10.000 złotych, przeznaczonego na zakup w systemie sprzedaży ratalnej w Firmie Handlowo - Usługowej Biuro Podróży PTTK z siedzibą w Brzegu 2 - tygodniowych wczasów w Turcji, przedłożył, za pośrednictwem K█████ N█████████ - właściciela firmy KLN Pośrednictwo Kredytowe z siedzibą w Kluczborku w wyżej wymienionym banku nierzetelne dokumenty na nazwisko Adama Romaniszyna, dotyczące okoliczności mających istotne znaczenie dla uzyskania przez niego kredytu w postaci:

➤ wniosku z dnia 14 sierpnia 1998 roku o udzielenie A█████ R█████████ kredytu w kwocie 10.000 złotych, na zakup w systemie sprzedaży ratalnej usługi w postaci 2-tygodniowych wczasów w Turcji, w Firmie Handlowo - Usługowej Biuro Podróży PTTK z siedzibą w Brzegu,

➤ rachunku uproszczonego o numerze 120/VIII/98 z dnia 14 sierpnia 1998 roku, wystawionego przez Firmę Handlowo - Usługową Biuro Podróży PTTK z siedzibą w Brzegu, dokumentującego fikcyjny zakup przez A█████ R█████████ 2-tygodniowych wczasów w Turcji o wartości 10.362,80 złotych,

➤ umowy kredytowej z dnia 17 sierpnia 1998 roku, zawartej przez Bank Zachodni Spółka Akcyjna Oddział w Namysłowie z kredytobiorcą A█████ R█████████, na zakup w systemie sprzedaży ratalnej usługi w postaci 2-tygodniowych wczasów w Turcji, w kwocie 10.000 złotych,

które to dokumenty zawierały nieprawdziwe informacje odnośnie przeznaczenia kredytu, ponieważ kredytowana usługa w rzeczywistości nie miała miejsca,

**11.** W dniu 17 sierpnia 1998 roku w Brzegu, działając w celu uzyskania przez ▮▮ B▮▮ kredytu bankowego w wysokości 10.000 złotych, przeznaczonego na zakup w systemie sprzedaży ratalnej w Firmie Handlowo - Usługowej Biuro Podróży PTTK z siedzibą w Brzegu 2 - tygodniowych wczasów w Turcji, przedłożył, za pośrednictwem K▮▮ N▮▮ - właściciela firmy KLN Pośrednictwo Kredytowe z siedzibą w Kluczborku w wyżej wymienionym banku nierzetelne dokumenty na nazwisko ▮▮ B▮▮, dotyczące okoliczności mających istotne znaczenie dla uzyskania przez nią kredytu w postaci:

➢ wniosku z dnia 14 sierpnia 1998 roku o udzielenie ▮▮ B▮▮ kredytu w kwocie 10 000 złotych na zakup w systemie sprzedaży ratalnej usługi w postaci 2 tygodniowych wczasów w Turcji w Firmie Handlowo - Usługowej Biuro Podróży PTTK z siedzibą w Brzegu,

➢ rachunku uproszczonego o numerze nr 119/VIII/98 z dnia 14 sierpnia 1998 roku, wystawionego przez Firmę Handlowo - Usługową Biuro Podróży PTTK z siedzibą w Brzegu, dokumentującego fikcyjny zakup przez ▮▮ B▮▮ 2-tygodniowych wczasów w Turcji dla czterech osób o wartości 10.362,80 złotych,

➢ umowy kredytowej z dnia 17 sierpnia 1998 roku, zawartej przez Bank Zachodni Spółka Akcyjna Oddział w Namysłowie z kredytobiorcą ▮▮ B▮▮ na zakup w systemie sprzedaży ratalnej usługi w postaci 2-tygodniowych wczasów w Turcji, w kwocie 10.000 złotych,

które to dokumenty zawierały nieprawdziwe informacje odnośnie przeznaczenia kredytu, ponieważ kredytowana usługa w rzeczywistości nie miała miejsca,

to jest o przestępstwo z artykułu 3 paragraf 1 Ustawy z dnia 12 października 1994 roku o ochronie obrotu gospodarczego i zmianie niektórych przepisów prawa karnego w związku z artykułem 265 paragraf 1 Ustawy z dnia 19 kwietnia 1969 roku Kodeks Karny przy zastosowaniu artykułu 10 paragraf 2 Ustawy z dnia 19 kwietnia 1969 roku Kodeks Karny i artykułu 58 paragraf 1 Ustawy z dnia 19 kwietnia 1969 roku Kodeks Karny w związku z artykułem 4 paragraf 1 Ustawy z dnia 19 kwietnia 1969 roku Kodeks Karny.

II.W okresie od 13 do 16 października 2009 roku w Konsulacie Generalnym Rzeczypospolitej Polskiej w Sao Paulo, działając w krótkich odstępach czasu, w wykonaniu z góry powziętego zamiaru, w celu uzyskania dla siebie paszportu tymczasowego, podstępnie wprowadził w błąd wicekonsula wyżej wymienionej placówki dyplomatycznej T█████Ł██ w ten sposób, że :

- w dniu 13 października 2009 roku przedłożył wniosek o wydanie dokumentu paszportowego, w którym podał nieprawdziwe dane personalne wnioskodawcy, a w miejscu podpisu składającego wniosek, oraz w miejscu podpisu posiadacza paszportu podrobił podpis J████ A███ A███████podpisując się za niego, oraz

- okazał jako swój dokument tożsamości zniszczony paszport o serii AM i numerze ████361 wystawiony przez Wojewodę Opolskiego na nazwisko brata J████ A███ A██████, po czym,

- po uprzednim pouczeniu o odpowiedzialności karnej przewidzianej w art. 233 paragraf 1 kodeksu karnego i inne złożył fałszywe pisemne oświadczenie o okolicznościach zniszczenia tego dokumentu paszportowego, na którym podrobił podpis brata J████ A███ A██████, a następnie

- w dniu 16 października 2009 roku, w miejscu podpisu osoby odbierającej paszport podrobił podpis J████ A███ A██████, podpisując się za niego

w wyniku czego wyłudził paszport tymczasowy o serii PA i numerze ████012 na nazwisko J████ A███ A██████ ze swoim wizerunkiem, w którym poświadczono nieprawdę co do tożsamości posiadacza paszportu,

to jest o przestępstwo z artykułu 272 kodeksu karnego w związku z artykułem 233 paragraf 6 w związku z paragrafem 1 kodeksu karnego i artykułu 270 paragraf 1 kodeksu karnego przy zastosowaniu artykułu 11 paragraf 2 kodeksu karnego w związku z artykułem 12 kodeksu karnego.

III. W dniu 20 października 2009 roku w Wydziale Konsularnym Ambasady Rzeczypospolitej Polskiej w Londynie usiłował wyłudzić poświadczenie nieprawdy w postaci paszportu  10 – letniego na nazwisko brata J████ A███ A██████ przedkładając wniosek o wydanie wyżej wymienionego dokumentu paszportowego, w którym podał nieprawdziwe dane personalne wnioskodawcy, oraz na którym, w

miejscu podpisu składającego wniosek, a także w miejscu podpisu posiadacza paszportu podrobił podpis brata J██████ A████ A███████, a nadto okazał pracownikowi konsulatu wyłudzony w Konsulacie Generalnym Rzeczypospolitej Polskiej w Sao Paulo paszport tymczasowy o serii PA i numerze ███012 wystawiony na nazwisko brata J██████ A████ A███████, jako dokument potwierdzający swoją tożsamość, a także, po uprzednim pouczeniu o odpowiedzialności karnej przewidzianej w art. 233 paragraf 1 kodeksu karnego złożył fałszywe pisemne oświadczenie o okolicznościach zniszczenia paszportu o serii AM i numerze ████361 wystawionego przez Wojewodę Opolskiego na nazwisko brata J█████ A███a A███████, na którym w miejscu podpisu osoby składającej wyjaśnienia podrobił podpis Jerzego Adama Antonowicza usiłując w ten sposób podstępnie wprowadzić w błąd urzędnika konsularnego tej placówki dyplomatycznej, upoważnionego do wystawienia dokumentu, lecz zamierzonego celu nie osiągnął z uwagi na podjęte przez niego czynności weryfikacyjne,

to jest o przestępstwo z artykułu 13 paragraf 1 kodeksu karnego w związku z artykułem 272 kodeksu karnego w związku z artykułem 273 kodeksu karnego i artykułem 233 paragraf 6 w związku z paragrafem 1 kodeksu karnego i artykułem 270 paragraf 1 kodeksu karnego przy zastosowaniu artykułu 11 paragraf 2 kodeksu karnego.

Na sprawstwo podejrzanego w zakresie zarzucanych mu czynów wskazują następujące materiały:

Numer 1 - Informacja Banku Zachodniego Spółka Akcyjna Oddział w Namysłowie z dnia 22 marca 1999 roku, wskazująca na współpracę firmy KLN K██████ N██████ z Firmą Handlowo - Usługową Biuro Podróży PTTK z siedzibą w Brzegu w przedmiocie pośrednictwa kredytowego wraz z dokumentacją kredytową. Dowód ten pozwala na ustalenie kręgu osób, które zawarły za pośrednictwem Firmy Handlowo - Usługowej Biuro Podróży PTTK z siedzibą w Brzegu, prowadzonym przez H████ i Adama Antonowiczów zakwestionowane w toku śledztwa umowy kredytowe na zakup imprez turystycznych, wysokości udzielonych kredytów oraz ich statusu. Pozwala również na ocenę rzetelności przekazywanych przez ujęte w zarzucie

formułowanym pod adresem Adama Antonowicza strony kwestionowanych umów kredytowych informacji mających istotne znaczenie w przedmiocie przyznania kredytów w określonej wysokości, jak również dokumentów jakimi posłużyli się wyżej wymienieni w celu wykazania swoich możliwości zarobkowych. Zabezpieczone umowy kredytowe zawierają nadto stosowne informacje odnośnie warunków na jakich przyznane zostały rzeczone kredyty gotówkowe, jak również wysokości należnej prowizji.

Numer 2 - protokół przesłuchania K████  N████████  w charakterze podejrzanego z dnia 10 maja 1999 roku. Wyjaśnienia K████  N████ prowadzącego działalność gospodarczą pod nazwą KLN Pośrednictwo Kredytowe z siedzibą w Kluczborku potwierdzają fakt współpracy z Adamem Antonowiczem w zakresie pośrednictwa kredytowego na zakup towarów w systemie sprzedaży ratalnej finansowanej przez Bank Zachodni Spółka Akcyjna Oddział w Namysłowie. K████  N████████  utrzymuje również, iż nie miał świadomości, że szereg przedkładanych mu przez Adama Antonowicza dokumentów, w tym głównie rachunków zakupu przez kredytobiorców usług turystycznych została sfałszowana.

Numer 3 - wyjaśnienia podejrzanego K████  N████████  z dnia 14 marca 2000 roku, z których wynika, iż przed rozpoczęciem współpracy z Adamem Antonowiczem osobiście przeszkolił go z obowiązujących wówczas w Banku Zachodnim Spółka Akcyjna procedur sprzedaży produktów w systemie ratalnym, w szczególności konieczności weryfikacji rzetelności oraz kompletności przedkładanych przez kredytobiorców dokumentów.

Numer 4 - zestawienie kredytów przekazanych do windykacji przez Bank Zachodni Spółka Akcyjna Oddział w Namysłowie, stanowiące załącznik do protokołu przesłuchania w charakterze świadka Mirosława Lewandowskiego - pracownika Banku Zachodniego Spółka Akcyjna Oddział w Namysłowie z dnia 4 maja 2000 roku. Dokument ten stanowi wykaz osób, które za pośrednictwem K████ N████████ oraz Adama Antonowicza zaciągnęły w Banku Zachodnim Spółka Akcyjna Oddział w Namysłowie kredyty na zakup w systemie sprzedaży ratalnej, wraz

z informacją o aktualnej  wysokości zadłużenia tych osób na dzień 30 kwietnia 2000 roku.

Numer 5 – uwierzytelnione kserokopie dokumentacji kredytowej na nazwisko M█████ K███████. Z dokumentów tych wynika, iż Adam Antonowicz pośredniczył w zawarciu przez M███ K███████ w dniu 13 sierpnia 1998 roku umowy kredytowej opiewającej na kwotę 10.000 złotych, na zakup w systemie sprzedaży ratalnej dwutygodniowych wczasów na Malcie dla dwóch osób. Sygnował bowiem swoim podpisem szereg dokumentów złożonych przez Marka Kurowskiego, w tym wniosek o udzielenie kredytu oraz umowę kredytową z dnia 13 sierpnia 1998 roku jako osoba uprawniona do przyjęcia wniosku i stwierdzenia autentyczności podpisów kredytobiorcy. Wystawił również w imieniu Biura Podróży PTTK w Brzegu i podpisał własnoręcznym podpisem rachunek uproszczony o numerze 115/VIII/98 z dnia 11 sierpnia 1998 roku, dokumentujący fikcyjny zakup przez M███ K███████ 2-tygodniowych wczasów na Malcie za kwotę 10. 890,46 złotych.

Numer 6 - protokół przesłuchania w charakterze podejrzanego M███ K███████ z dnia 30 lipca 2003 roku. Z wyjaśnień M███ K███████ wynika, iż faktycznie zaciągnął w Banku Zachodnim Spółka Akcyjna Oddział w Namysłowie kredyt opiewający na kwotę 10 000 złotych z tym, że nie na zakup wycieczki zagranicznej lecz na prośbę sąsiadki J██████ M█████████, której przekazał całą ostatecznie uzyskaną kwotę 7.400 złotych. M███ K███████ potwierdził także fakt podpisania wszystkich okazanych mu dokumentów kredytowych, które w imieniu Firmy Handlowo - Usługowej Biuro Podróży PTTK Oddział w Brzegu sygnował nieznany mu mężczyzna o personaliach Adam Antonowicz. M███ K███████ nigdy bowiem nie pojawił się w Firmie Handlowo - Usługowej Biuro Podróży PTTK Oddział w Brzegu, celem dopełnienia wymaganych formalności. W przekazaniu dokumentów potrzebnych do zawarcia umowy kredytowej a następnie wydaniu pieniędzy przyznanego kredytu pośredniczył bowiem uczestniczący wraz z Adamem Antonowiczem w przestępczym procederze A████ D█████. Z oświadczenia M█████ K███████ wynika także, iż w dacie przesłuchania nie uiścił żadnej raty

zaciągniętego kredytu, gdyż do jego spłaty zobligowała się J█████ M██████████,
której zeznań nie zdołano pozyskać z uwagi na jej śmierć.

Numer 7 – protokół przesłuchania w charakterze świadka W█████ C█████ z dnia 22
października 1999 roku. Z zeznań tego świadka wynika, iż skontaktowała ona swojego
brata M███ K███████████ z A██████ D██████, który zaproponował mu pomoc w
uzyskaniu kredytu gotówkowego w kwocie 10 000 złotych. Z relacji tego świadka
wynika, iż M███ K███████ przekazał A██████ D██████ wymagane do uzyskania
kredytu dokumenty a następnie za jego pośrednictwem podpisał umowę kredytową. Z
kwoty 10 000 złotych o jaką się ubiegał otrzymał jednak tylko 7.400 złotych. Gdy
M███ K███████ poprosił o wyjaśnienie tej sytuacji okazało się, że A█████ D██████
potrącił sobie kwotę 200 złotych za paliwo, natomiast pozostałą prowizję pobrał jego
kolega, który faktycznie pośredniczył w uzyskaniu kredytu. Jak ustalono wspomnianą
osobą był Adam Antonowicz, który w celu uzyskania kredytu dla M█████ K█████████,
wystawił fikcyjny rachunek, z którego wynikało, iż został on przeznaczony na
sfinansowanie wycieczki na Cypr.

Numer 8 – uwierzytelnione kserokopie dokumentacji kredytowej na nazwisko J██████
K████████. Z dokumentów tych wynika, iż Adam Antonowicz pośredniczył w
zawarciu przez J███████ K███████ w dniu 4 sierpnia 1998 roku umowy kredytowej
opiewającej na kwotę 10.000 złotych,   na zakup w systemie sprzedaży ratalnej
dwutygodniowych wczasów na Majorce dla czterech osób. Sygnował bowiem swoim
podpisem szereg dokumentów złożonych przez J███████ K███████, w tym wniosek o
udzielenie kredytu oraz umowę kredytową z dnia 4 sierpnia 1998 roku jako osoba
uprawniona do przyjęcia wniosku i stwierdzenia autentyczności podpisów
kredytobiorcy. Wystawił również w imieniu Firmy Handlowo - Usługowej Biuro
Podróży PTTK Oddział w Brzegu rachunek uproszczony o numerze 101/VII/98 z dnia
31 lipca 1998 roku dokumentujący fikcyjny zakup przez J██████ K███████ 2-
tygodniowych wczasów na Majorce dla czterech osób za kwotę 11 1776,36 złotych. Z
kolei z oświadczenia kredytobiorcy o poddaniu się egzekucji z dnia 4 sierpnia 1998
roku wynika, iż Adam Antonowicz przyjął od J██████ K███████ oświadczenie, iż

otrzymała ona z tytułu zawartej umowy o kredyt w systemie sprzedaży ratalnej kwotę 10. 000 złotych.

Numer 9 - protokół przesłuchania w charakterze świadka J███ K███ z dnia 26 kwietnia 1999 roku. Z zeznań tego świadka wynika, iż zakupiła ona pod koniec lipca 1998 roku w Firmie Handlowo - Usługowej Biuro Podróży PTTK Oddział w Brzegu, wczasy na Majorce dla czterech osób. Wszystkie formalności związane z rzeczonym kredytem z ramienia biura podróży załatwiał znany jej od wielu lat Adam Antonowicz. Ponieważ w sierpniu 1998 roku konkubent J███ K███ uległ wypadkowi komunikacyjnemu zmuszona była zrezygnować z wakacji. Uzyskała wówczas od Adama Antonowicza kwotę 9. 000 złotych tytułem rzekomego przekwalifikowania zaciągniętego na zakup imprezy turystycznej kredytu na kredyt gotówkowy. Jak ustalono nie posiadała ona w owym czasie ważnego paszportu a pomimo uzyskania środków finansowych do daty przesłuchania spłaciła tylko jedną ratę przyznanego jej kredytu zalegając ze spłatą pozostałej kwoty.

Numer 10 - uwierzytelnione kserokopie dokumentacji kredytowej na nazwisko P███ M███. Z dokumentów tych wynika, iż Adam Antonowicz pośredniczył w zawarciu przez P███ M███ w dniu 4 sierpnia 1998 roku umowy kredytowej opiewającej na kwotę 2.000 złotych, na zakup w systemie sprzedaży ratalnej dwutygodniowych wczasów w Hiszpanii. Sygnował bowiem swoim podpisem szereg dokumentów złożonych przez P███ M███, w tym wniosek o udzielenie kredytu oraz umowę kredytową z dnia 4 sierpnia 1998 roku jako osoba uprawniona do przyjęcia wniosku i stwierdzenia autentyczności podpisów kredytobiorcy. Wystawił również w imieniu Firmy Handlowo - Usługowej Biuro Podróży PTTK Oddział w Brzegu rachunek uproszczony o numerze 98/VII/98 z dnia 28 lipca 1998 roku dokumentujący fikcyjny zakup przez P███ M███ 2- tygodniowych wczasów Hiszpanii za kwotę 2.500 złotych.

Numer 11 - protokół przesłuchania w charakterze świadka P███ M███ z dnia 25 lutego 1999 roku. Z zeznań tego świadka wynika, iż jego kolega Adam Antonowicz przedstawił mu propozycję uzyskania kredytu gotówkowego bez zbędnych

formalności. Wedle zapewnień Adama Antonowicza warunkiem uzyskania kredytu w systemie sprzedaży ratalnej  było fikcyjne wykupienie w prowadzonej przez niego Firmie Handlowo - Usługowej Biuro Podróży PTTK Oddział w Brzegu usługi turystycznej. Gdy P███ M██████ wyraził na to zgodę Adam Antonowicz przygotował a następnie wypełnił wszelkie wymagane dokumenty wystawiając nadto w dniu 28 lipca 1998 roku poświadczający nieprawdę rachunek uproszczony o numerze 98/VII/98, z którego wynika, iż zaciągnięty przez P███ M██████ kredyt został przeznaczony na zakup wczasów dla dwóch osób w Hiszpanii o łącznej wartości 2.500 złotych. Z relacji P███ M██████ wynika natomiast, iż uzyskał on od Adama Antonowicza w ramach przyznanego kredytu kwotę 1.500 bądź 1600 złotych mając pełną świadomość naruszenia procedur wymaganych dla uzyskania kredytu. W dacie przesłuchania P███ M██████ nie spłacił żadnej raty zaciągniętego kredytu tłumacząc to nieznajomością ustalonej przez bank wysokości raty kredytowej oraz brakiem harmonogramu spłat.

Numer 12 - protokół przesłuchania w charakterze podejrzanego P███ M██████ z dnia 9 czerwca 2003 roku.  Z wyjaśnień P███ M██████ jednoznacznie wynika, iż potrzebując pilnie pieniędzy, za namową Adama Antonowicza oraz pod pretekstem zakupu w Firmie Handlowo - Usługowej Biuro Podróży PTTK Oddział w Brzegu w systemie ratalnym wczasów w Hiszpanii zaciągnął w Banku Zachodnim Spółka Akcyjna Oddział w Namysłowie kredyt w kwocie 2.000 złotych. W tym celu podpisał wszystkie przekazane mu przez podejrzanego dokumenty wraz ze sporządzonym z datą 28 lipca 1998 roku rachunkiem uproszczonym o numerze 98/VII/98, wystawionym przez Firmę Handlowo - Usługową Biuro Podróży PTTK Oddział w Brzegu i dokumentującym fikcyjny zakup dwutygodniowych wczasów w Hiszpanii o wartości 2.500 złotych. Z przyznanej przez bank kwoty kredytu Adam Antonowicz wręczył mu jednak tylko 1.500 złotych oświadczając, iż pozostała kwota stanowi koszty oraz prowizję z tytułu załatwienia szybkiej pożyczki gotówkowej. Z uwagi na trudną sytuację finansową P███ M██████ w dacie przesłuchania nie spłacił zaciągniętego kredytu.

Numer 13 – oryginały dokumentacji kredytowej na nazwisko A█████ R████████. Z dokumentów tych wynika, iż Adam Antonowicz pośredniczył w zawarciu przez A████ R████████ w dniu 17 sierpnia 1998 roku umowy kredytowej opiewającej na kwotę 10. 000 złotych, na zakup w systemie sprzedaży ratalnej dwutygodniowych wczasów w Turcji. Sygnował bowiem swoim podpisem szereg dokumentów złożonych przez A██████ R████████, w tym wniosek o udzielenie kredytu oraz umowę kredytową z dnia 17 sierpnia 1998 roku jako osoba uprawniona do przyjęcia wniosku i stwierdzenia autentyczności podpisów kredytobiorcy. Wystawił również w imieniu Firmy Handlowo - Usługowej Biuro Podróży PTTK Oddział w Brzegu, rachunek uproszczony o numerze 120/VIII/98 z dnia 14 sierpnia 1998 roku dokumentujący fikcyjny zakup przez A██████ R██████ 2- tygodniowych wczasów w Turcji za kwotę 10.362 złotych.

Numer 14 - protokół przesłuchania w charakterze świadka A█████ R████████ z dnia 13 marca 2003 roku. Z zeznań tego świadka wynika, iż nigdy nie zaciągał on kredytu w Banku Zachodnim Spółka Akcyjna Oddział w Namysłowie na zakup wczasów w Turcji o łącznej wartości 10. 000 złotych, albowiem jakikolwiek zagraniczny wyjazd uniemożliwiał mu brak paszportu, trudna sytuacja finansowa oraz posiadanie na utrzymaniu trojga małoletnich dzieci. Świadek przyznał jednak, iż na prośbę I█████ B██████ przekazał jej znajomej, których personaliów nie pamiętał, swoje zaświadczenie o zatrudnieniu i zarobkach w firmie Garbarnia Brzeg, aby w oparciu o niniejszy dokument wskazana osoba mogła zaciągnąć kredyt. A████ R██████ potwierdził jednocześnie fakt sygnowania swoim podpisem szeregu dokumentów kredytowych kwestionując jednocześnie prawdziwość znajdujących się na umowie kredytowej niektórych swoich danych osobowych oraz autentyczność swojego podpisu na rachunku uproszczonym wystawionym przez Adama Antonowicza w imieniu Firmy Handlowo - Usługowej Biuro Podróży PTTK Oddział w Brzegu, dokumentującym zakup imprezy turystycznej w Turcji. Świadek nigdy nie był w biurze podróży PTTK Oddział w Brzegu. Nie miał też nigdy osobistego kontaktu z Adamem Antonowiczem.

Numer 15 – protokół przesłuchania w charakterze podejrzanego A██ R████████
z dnia 7 listopada 2003 roku. Z wyjaśnień złożonych przez A██ R████████
wynika, iż na prośbę █ B█████ zaciągnął za pośrednictwem Adama
Antonowicza kredyt w kwocie 10.000 złotych, który zobligowała się spłacać jej
znajoma W████ C███. Ponieważ nie pokwitował w żadnym banku odbioru
środków finansowych tytułem  udzielonego kredytu pozostawał w przekonaniu, iż
rzeczony kredyt ten nie został ostatecznie mu przyznany. W związku z powyższym nie
spłacił żadnej raty.

Numer 16 – uwierzytelnione kserokopie dokumentacji kredytowej na nazwisko █
B█████. Z dokumentów tych wynika, iż Adam Antonowicz pośredniczył w
zawarciu przez █ B█████ w dniu 17 sierpnia 1998 roku umowy kredytowej
opiewającej na kwotę 10.000 złotych na zakup w systemie sprzedaży ratalnej
dwutygodniowych wczasów w Turcji. Sygnował bowiem swoim podpisem szereg
dokumentów złożonych przez █ B█████, w tym wniosek o udzielenie kredytu
oraz umowę kredytową z dnia 17 sierpnia 1998 roku jako osoba uprawniona do
przyjęcia wniosku i stwierdzenia autentyczności podpisów kredytobiorcy. Wystawił
również w imieniu Firmy Handlowo - Usługowej Biuro Podróży PTTK Oddział w
Brzegu rachunek uproszczony o numerze 119/VIII/98 z dnia 14 sierpnia 1998 roku
dokumentujący fikcyjny zakup przez █ B█████ 2- tygodniowych wczasów w
Turcji dla czterech osób za kwotę 10.362 złotych.

Numer 17 - protokół przesłuchania w charakterze świadka █ B█████ z dnia 26
kwietnia 1999 roku. Z zeznań tego świadka wynika, iż pozostając w trudnej sytuacji
materialnej, z chwilą uzyskania informacji o możliwości załatwienia przez mężczyznę
o personaliach A██ D████ kredytu gotówkowego bez konieczności stawiennictwa
w banku zdecydowała się za jego pośrednictwem uzyskać w Banku Zachodnim Spółka
Akcyjna Oddział w Namysłowie kredyt opiewający na kwotę 10 000 złotych.
Rzeczony kredyt miał zostać przeznaczony przez █ B█████ na remont
mieszkania. Z zeznań tego świadka wynika, iż po kilku tygodniach od daty podpisania
i złożenia wszystkich wymaganych dokumentów A██ D████ przekazał jej tytułem
przyznanego kredytu potrąconą o znaczną prowizję kwotę 6.937 złotych. █

B███ nie potrafiła sobie przypomnieć okoliczności wystawienia przez Adama Antonowicza w imieniu Firmy Handlowo - Usługowej Biuro Podróży PTTK Oddział w Brzegu okazanego jej rachunku, stanowiącego dowód rzekomego zakupu przez nią imprezy turystycznej. Nie była ona bowiem nigdy zainteresowana wykupieniem w tym biurze podróży żadnych wczasów. Z uwagi na swoją fatalną kondycję finansową do chwili przesłuchania nie spłaciła również żadnej raty przyznanego jej kredytu. Jak wynika z poczynionych ustaleń I██ B███ nie miała osobiście żadnego kontaktu z Adamem Antonowiczem, bowiem w załatwieniu wszelkich formalności kredytowych pośredniczył A██ D███, który jak ustalono, pozyskiwał dla podejrzanego osoby zainteresowane zaciągnięciem kredytów z pominięciem obowiązujących procedur. Przekazywał też kredytobiorcom, którzy nie mieli bezpośredniego kontaktu z podejrzanym pieniądze przyznanego kredytu, potrąconego jednak uprzednio przez Adama Antonowicza o znaczną prowizję.

Numer 18 – oryginały dokumentacji kredytowej W███ B███. Z dokumentów tych wynika, iż Adam Antonowicz pośredniczył w zawarciu przez W███ B███ w dniu 10 sierpnia 1998 roku umowy kredytowej opiewającej na kwotę 2.400 złotych przeznaczonej na zakup w systemie sprzedaży ratalnej dwutygodniowych wczasów na Cyprze dla dwóch osób. Sygnował bowiem swoim podpisem szereg dokumentów złożonych przez W███ B███, w tym wniosek o udzielenie kredytu oraz umowę kredytową z dnia 10 sierpnia 1998 roku jako osoba uprawniona do przyjęcia wniosku i stwierdzenia autentyczności podpisów kredytobiorcy. Z kolei w imieniu Firmy Handlowo - Usługowej Biuro Podróży PTTK w Brzegu rachunek uproszczony o numerze 112/VIII/98 z dnia 7 sierpnia 1998 roku, dokumentujący fikcyjny zakup przez W███ B███ 2- tygodniowych wczasów na Cyprze dla dwóch osób za kwotę 4.576 złotych wystawiała nie związana stosunkiem zatrudnienia współpodejrzana K███ D███.

Numer 19 - protokół przesłuchania w charakterze podejrzanej W███ B███ z dnia 28 marca 2003 roku. Z wyjaśnień tego świadka wynika, iż potrzebując pieniędzy na opłacenie wyjazdu wakacyjnego, za namową znanego jej od wielu lat Adama Antonowicza zdecydowała się zaciągnąć w prowadzonej przez niego Firmie

Handlowo - Usługowej Biuro Podróży PTTK w Brzegu kredyt na jego sfinansowanie. Z informacji przekazanych jej przez podejrzanego wynikało, iż do przyznania kredytu przez Bank Zachodni Spółka Akcyjna Oddział w Namysłowie konieczne jest wystawienie rachunku dokumentującego zakup imprezy turystycznej. Gdy W███████ B███████ wyraziła na to zgodę Adam Antonowicz wystawił w imieniu Firmy Handlowo - Usługowej Biuro Podróży PTTK w Brzegu fikcyjny rachunek poświadczający rzekomy zakup wczasów na Cyprze dla dwóch osób o łącznej wartości 4.576 złotych. W███████ B███████ potwierdziła fakt złożenia własnoręcznych podpisów na okazanej jej dokumentacji kredytowej, którą w imieniu biura podróży sporządził Adam Antonowicz. Kategorycznie zaprzeczyła jednak, aby posłużyła się w celu uzyskania rzeczonego kredytu zaświadczeniem o zatrudnieniu i zarobkach w Polskim Towarzystwie Turystyczno - Krajoznawczym Oddział Ziemi Brzeskiej w Brzegu z dnia 6 sierpnia 1998 roku, potwierdzając fakt jego sfałszowania. Nigdy bowiem nie była zatrudniona na stanowisku prezesa zarządu oddziału z wynagrodzeniem miesięcznym w kwocie 2.120 złotych. Funkcja którą pełniła bowiem w Polskim Towarzystwie Turystyczno - Krajoznawczym Oddział Ziemi Brzeskiej była funkcją społeczną, z którą nie wiązała się żadna gratyfikacja finansowa. W███████ B███████ zakwestionowała również fakt wystawienia w dniu 30 kwietnia 1998 roku okazanego jej zaświadczenia o zatrudnieniu i zarobkach Adama Antonowicza w wyżej wymienionym towarzystwie utrzymując, iż jej podpis na tym dokumencie został podrobiony tym bardziej, iż podejrzany nigdy nie był pracownikiem organizacji turystycznej, którą reprezentowała.

Numer 20 – protokół przesłuchania w charakterze podejrzanej W███████ B███████ z dnia 6 listopada 2003 roku. Z wyjaśnień W███████ B███████ wynika, iż jej podpis na zaświadczeniu o zatrudnieniu i zarobkach wystawionym w dniu 6 sierpnia 1998 roku na nazwisko matki podejrzanego H███ A███████ przez Polskie Towarzystwo Turystyczno -Krajoznawcze Oddział Ziemi Brzeskiej w Brzegu został sfałszowany.

Numer 21 – uwierzytelnione kserokopie dokumentacji kredytowej na nazwisko E███ B███████. Z dokumentów tych wynika, iż Adam Antonowicz pośredniczył w  zawarciu przez Elżbietę Bojanowską w dniu 20 lipca 1998 roku

umowy kredytowej opiewającej na kwotę 9.000 złotych na zakup w systemie sprzedaży ratalnej dwutygodniowych wczasów w Tajlandii. Sygnował bowiem swoim podpisem szereg dokumentów złożonych przez B███ B███████, w tym wniosek o udzielenie kredytu oraz umowę kredytową z dnia 10 sierpnia 1998 roku jako osoba uprawniona do przyjęcia wniosku i stwierdzenia autentyczności podpisów kredytobiorcy. Wystawił również w imieniu Firmy Handlowo - Usługowej Biuro Podróży PTTK w Brzegu rachunek uproszczony o numerze 59/VII/98 z dnia 17 lipca 1998 roku, dokumentujący fikcyjny zakup przez B█████. B███████ 2-tygodniowych wczasów w Tajlandii dla trzech osób za kwotę 10.631,16 złotych.

Numer 22 - protokół przesłuchania w charakterze świadka B███ B█████████ z dnia 26 kwietnia 1999 roku. Z zeznań tego świadka, który jest spokrewniony z podejrzanym Adamem Antonowiczem wynika, iż zaciągnęła ona w 1998 roku za pośrednictwem Firmy Handlowo - Usługowej Biuro Podróży PTTK w Brzegu kredyt w wysokości 9.000 złotych, który stosownie do złożonej deklaracji miał zostać przeznaczony na opłacenie wakacyjnego wyjazdu do Tajlandii. W tym celu podpisała wszystkie wymagane dokumenty kredytowe, które przedłożyła w Banku Zachodnim Spółka Akcyjna Oddział w Namysłowie za pośrednictwem biura podróży. Stosownie do deklaracji B███ B█████████ podczas rzeczonych wakacji towarzyszyć jej mieli także siostrzeniec z żoną, którym sfinansowała wyjazd opiewający łącznie na kwotę 10.631,16 złotych. Z uwagi na fakt, iż na kilka dni przez planowanym wyjazdem B███ B█████ zachorowała zmuszona była zrezygnować z wakacji w Tajlandii, podobnie jak pozostali uczestnicy tego wyjazdu. B███ B█████ nie potrafiła wskazać konkretnego miejsca swojego wakacyjnego pobytu w Tajlandii, jak również potwierdzić faktu uzyskania wizy wjazdowej. Wedle jej zeznań, z uwagi na fakt, iż do rezygnacji z wakacji doszło na krótki czas przed planowanym wyjazdem nie uzyskała żadnego zwrotu wydatków poniesionych na zakup tej imprezy turystycznej dokonując jednak systematycznej spłaty zaciągniętego kredytu.

Numer 23 – uwierzytelnione kserokopie dokumentacji kredytowej na nazwisko B██ K██████. Z dokumentów tych wynika, iż Adam Antonowicz pośredniczył w zawarciu przez B██ K██████ w dniu 13 sierpnia 1998 roku umowy kredytowej,

opiewającej na kwotę 3.700 złotych, na zakup w systemie sprzedaży ratalnej dwutygodniowych wczasów na Halkidiki. Sygnował bowiem swoim podpisem szereg dokumentów złożonych przez F█ K█████, w tym wniosek o udzielenie kredytu oraz umowę kredytową z dnia 13 sierpnia 1998 roku jako osoba uprawniona do przyjęcia wniosku i stwierdzenia autentyczności podpisów kredytobiorcy. Wystawił również w imieniu Firmy Handlowo - Usługowej Biuro Podróży PTTK w Brzegu rachunek uproszczony o numerze 113/VIII/98 z dnia 11 sierpnia 1998 roku dokumentujący fikcyjny zakup przez F█ K█████ 2- tygodniowych wczasów na Halkidiki dla dwóch osób o łącznej wartości 4.256,80 złotych

Numer 24 - protokół przesłuchania w charakterze podejrzanej B█ K█████ z dnia 7 listopada 2003 roku. Z wyjaśnień tego świadka wynika, iż nigdy nie była na wakacjach na Halkidiki potwierdzając jednocześnie, iż wypełniła oraz podpisała wszystkie okazane jej dokumenty kredytowe dotyczące umowy kredytowej z dnia 13 sierpnia 1998 roku. Wszelkie formalności związane z uzyskaniem rzeczonego kredytu B█ K█████ załatwiła za pośrednictwem poleconych jej przez sąsiadkę J█ M█████ osób, których personaliów nie potrafiła sobie przypomnieć. Jak ustalono świadek nie była w Firmie Handlowo - Usługowej Biuro Podróży PTTK w Brzegu a przyznany jej kredyt pomniejszony został o 700 złotych jako prowizja i koszty osób uczestniczących w jego uzyskaniu. Pomimo tego, iż nie miała ona osobistego kontaktu z podejrzanym Adamem Antonowiczem nie ulega wątpliwości, iż to za jego pośrednictwem uzyskała wspomniany kredyt z pominięciem obowiązujących procedur.

Numer 25 – uwierzytelnione kserokopie dokumentacji kredytowej na nazwisko K█████ D█████. Z dokumentów tych wynika, iż Adam Antonowicz pośredniczył w zawarciu przez K█████ D█████ w dniu 27 kwietnia 1998 roku umowy kredytowej opiewającej na kwotę 4.000 złotych na zakup w systemie sprzedaży ratalnej dwutygodniowych wczasów w Zakopanem. Sygnował bowiem swoim podpisem szereg dokumentów złożonych przez K█████ D█████, w tym wniosek o udzielenie kredytu oraz umowę kredytową z dnia 27 kwietnia 1998 roku jako osoba uprawniona do przyjęcia wniosku i stwierdzenia autentyczności podpisów

kredytobiorcy. Wystawił również w imieniu Firmy Handlowo - Usługowej Biuro Podróży PTTK w Brzegu rachunek uproszczony o numerze 11/IV/98 z dnia 27 kwietnia 1998 roku, dokumentujący fikcyjny zakup przez K█████ D█████ 2 - tygodniowych wczasów w Zakopanem dla dwóch osób o łącznej wartości 4.200 złotych.

Numer 26 - protokół przesłuchania w charakterze podejrzanej K█████ S█████ poprzednio Dziedzic z dnia 7 sierpnia 2003 roku. Z wyjaśnień K█████ S█████ wynika, iż zakupiła ona dla swojej rodziny w Firmie Handlowo - Usługowej Biuro Podróży PTTK w Brzegu wyjazd do Zakopanego, który za pośrednictwem jej bliskiego znajomego Adama Antonowicza skredytował Bank Zachodni Spółka Akcyjna Oddział w Namysłowie. Potwierdziła również fakt sygnowania własnym podpisem wszystkich okazanych jej dokumentów kredytowych. Nie potrafiła jednak podać żadnych szczegółów tego wyjazdu, ponieważ w nim nie uczestniczyła z uwagi na niemożność wzięcia urlopu. W związku z tym, zamiast niej na wakacje z jej rodziną pojechała koleżanka K█████ Z█████. Z poczynionych w toku rzeczonego śledztwa ustaleń wynika jednak, iż w dokumentacji handlowej Firmy Handlowo - Usługowej Biuro Podróży PTTK w Brzegu znajdował się również drugi rachunek o analogicznym numerze 11/IV/98 z tym, że wystawiony z datą 1 kwietnia 1998 roku na nazwisko osoby o personaliach A█ Z███. Rachunek ten dokumentował faktyczny zakup przez A█ Z██ usługi turystycznej w postaci wycieczki na Litwę o wartości 300 złotych, co dodatkowo potwierdza fakt wystawienia przez Adama Antonowicza w dniu 27 kwietnia 1998 roku nierzetelnego oraz poświadczającego nieprawdę rachunku na nazwisko K█████ S█████.

Pomimo tego, iż K█████ S█████ nigdy nie była zatrudniona w Firmie Handlowo - Usługowej Biuro Podróży PTTK w Brzegu nie widziała nic niestosownego w fakcie sygnowania własnoręcznym podpisem dokumentów wystawionych w imieniu tego biura, bowiem często w nim przebywała pozostając w zażyłych relacjach towarzyskich z podejrzanym. Zdaniem K█████ S█████ najprawdopodobniej pod nieobecność Haliny i Adama Antonowiczów w biurze otrzymała ustne pełnomocnictwo od podejrzanego do wystawienia rachunku o numerze 112/VIII/98 z dnia 7 sierpnia 1998 roku na nazwisko W█████ B█████,

dokumentującego zakup przez nią za kwotę 4.576 złotych usługi w postaci wakacji na Cyprze.

Numer 27 - protokół przesłuchania w charakterze świadka K████ Z████ z dnia 26 września 2003 roku. Z zeznań tego świadka wynika, iż w 1998 roku nie wyjeżdżała na zaproszenie państwa D████ na wakacje do Zakopanego.

Numer 28 - protokół przesłuchania w charakterze świadka O████ Z████ z dnia 26 sierpnia 2003 roku. Z zeznań tego świadka wynika, iż wyklucza ona fakt wyjazdu córki K████ Z████ na urlop do Zakopanego z rodziną państwa D████. Nie korzystała ona bowiem nigdy z usług Firmy Handlowo - Usługowej Biuro Podróży PTTK w Brzegu.

Numer 29 - protokół przesłuchania w charakterze świadka A████ W████ z dnia 25 kwietnia 2003 roku. Z zeznań tego świadka, który w dacie zarzucanych znanemu mu osobiście Adamowi Antonowiczowi czynów był pracodawcą K████ S████ wynika, iż wbrew jej twierdzeniom w ramach prowadzonego przez siebie Towarzystwa Inwestycyjno – Finansowego nigdy nie zajmowano się weryfikacją dokumentów kredytowych klientów Firmy Handlowo - Usługowej Biuro Podróży PTTK w Brzegu. Świadek ten przyznał również, iż uwagi na bliskie sąsiedztwo obu firm K████ S████ była częstym gościem Firmy Handlowo - Usługowej Biuro Podróży PTTK w Brzegu oraz Adama Antonowicza.

Numer 30 - oryginały dokumentacji kredytowej na nazwisko Adama Antonowicza. Z dokumentów tych wynika, iż Adam Antonowicz za pośrednictwem firmy KLN Pośrednictwo Kredytowe K████ N████ z siedzibą w Kluczborku zawarł w dniu 6 maja 1998 roku umowę kredytową opiewającą na kwotę 3.500 złotych na zakup w systemie sprzedaży ratalnej wczasów w Tunezji. Sygnował bowiem swoim podpisem jako kredytobiorca szereg dokumentów kredytowych, w tym wniosek o udzielenie kredytu oraz umowę kredytową z dnia 6 maja 1998. W celu uzyskania przedmiotowego kredytu posłużył się również rachunkiem uproszczonym wystawionym przez Firmę Handlowo - Usługową Biuro Podróży PTTK w Brzegu o

numerze 19/V/98 z dnia 27 kwietnia 1998 roku, na którym w miejscu wystawcy podrobiono podpis A⬛ L⬛. Rachunek ten dokumentował fikcyjny zakup przez Adama Antonowicza 2- tygodniowych wczasów w Tunezji dla dwóch osób o łącznej wartości 3.568 złotych.

Numer 31 - protokół przesłuchania w charakterze świadka A⬛ L⬛ z dnia 29 lipca 2003 roku. Z zeznań tego świadka wynika, iż w okresie od czerwca 1998 roku do sierpnia 1998 roku była nieoficjalnie zatrudniona w Firmie Handlowo - Usługowej Biuro Podróży PTTK w Brzegu pomagając H⬛ i Adamowi Antonowiczom w sprzedaży ofert turystycznych. Z zeznań tego świadka wynika, iż nigdy nie została upoważniona do wystawiania w imieniu tego biura rachunków dokumentujących sprzedaż usług turystycznych. Odnośnie okazanego jej rachunku uproszczonego o numerze 19/V/98 z dnia 27 kwietnia 1998 roku na nazwisko Adama Antonowicza oświadczyła, iż podpis o treści A⬛ L⬛ został ewidentnie podrobiony, tym bardziej, iż rozpoczęła ona pracę dopiero w czerwcu 1998 roku. A⬛ L⬛ zeznała również, iż kredyt zaciągnięty przez K⬛ D⬛ od samego początku miał zostać przeznaczony na remont mieszkania a nie na zakup rzekomego wyjazdu wakacyjnego do Zakopanego.

Numer 32 - oryginały dokumentacji kredytowej na nazwisko H⬛ A⬛. Z dokumentów tych wynika, iż H⬛ A⬛ zawarła w dniu 7 sierpnia 1998 roku za pośrednictwem firmy KLN Pośrednictwo Kredytowe K⬛ N⬛ z siedzibą w Kluczborku umowę kredytową opiewającą na kwotę 10.000 złotych na zakup w systemie sprzedaży ratalnej wczasów na Teneryfie. Sygnowała bowiem swoim podpisem jako kredytobiorca szereg dokumentów kredytowych, w tym wniosek o udzielenie kredytu oraz umowę kredytową z dnia 7 sierpnia 1998 roku. W celu uzyskania przedmiotowego kredytu H⬛ A⬛ posłużyła się również rachunkiem uproszczonym wystawionym przez Firmę Handlowo - Usługową Biuro Podróży PTTK w Brzegu o numerze 109/VIII/98 z dnia 6 sierpnia 1998 roku, na którym w miejscu wystawcy swój podpis złożyła niezatrudniona tam K⬛ D⬛. Rachunek ten dokumentował fikcyjny zakup przez H⬛ A⬛ 2- tygodniowych wczasów na Teneryfę dla trzech osób o łącznej wartości 10.797

złotych. Nadto H███ A████████ posłużyła się sfałszowanym i poświadczającym nieprawdę zaświadczeniem o zatrudnieniu i zarobkach w Polskim Towarzystwie Turystyczno - Krajoznawczym Oddział Ziemi Brzeskiej w Brzegu z dnia 6 sierpnia 1998 roku, na którym podrobiono podpis kierownika zakładu pracy - W████████ B████████.

Numer 33 – protokół przesłuchania w charakterze świadka H████ A████████ z dnia 3 kwietnia 2003 roku. Z zeznań tego świadka wynika, iż działalność gospodarczą pod nazwą Firma Handlowo - Usługowa Biuro Podróży PTTK H████ A████████ prowadziła od kwietnia 1997 roku do 30 września 1998 roku w Brzegu przy ul. Sukiennice 2. Przedmiotem działalności tej firmy było pośrednictwo w obsłudze krajowego i zagranicznego ruchu turystycznego. Ustanowionymi pełnomocnikami niniejszego Biura Podróży byli siostra wyżej wymienionej E████ B████████ oraz jej dwaj synowie Adam i J███ Antonowicz. Świadek kategorycznie zaprzeczyła, aby kiedykolwiek zatrudniała w swojej firmie osoby o personaliach K████ D████████, czy też A███ L████████, których podpisy znalazły się na wystawionych w imieniu prowadzonego przez nią B███ P████████ rachunkach zakupu imprez turystycznych przez Adama Antonowicza oraz W████████ B████████.

Numer 34 - protokół przesłuchania w charakterze świadka W████████ C████████ z dnia 9 maja 2003 roku. Świadek ten pełniący w dacie przesłuchania społeczną funkcję skarbnika Oddziału Polskiego Towarzystwa Turystyczno - Krajoznawczego Ziemi Brzeskiej zaprzeczył, aby kiedykolwiek wystawił zaświadczenie o zatrudnieniu i zarobkach na nazwisko W████████ B████████ z dnia 6 sierpnia 1998 roku potwierdzając jednocześnie autentyczność pieczęci Towarzystwa znajdujących się na tym dokumencie. Świadek ten potwierdził również fakt sfałszowania swojego podpisu na okazanym mu zaświadczeniu.

Numer 35 - protokół przeszukania mieszkania przy ul. Robotniczej 18/9 w Brzegu zajmowanego przez Adama Antonowicza oraz H████ A████████ przeprowadzonego w dniu 31 marca 2003 roku. W toku tej czynności zabezpieczono dokumentację

handlową oraz księgową dotyczącą prowadzonej przez H███ A███████ Firmy
Handlowo - Usługowej Biuro Podróży PTTK  w Brzegu.

Numer 36 - opinia biegłego z zakresu badania pisma ręcznego  i dokumentów z dnia
17 października 2003 roku. Dowód ten wskazuje na to, iż zakwestionowane w toku
śledztwa podpisy A███ L██████, W██████ C█████████, W██████ B████████
oraz K█████ S██ zostały podrobione. Nie zostały jednocześnie nakreślone przez
Adama Antonowicza.

Numer 37- protokół przesłuchania Adama Antonowicza w charakterze podejrzanego z
dnia 11 maja 1999 roku. Z wyjaśnień Adama Antonowicza, w toku których nie
przyznał się on do popełnienia żadnego ze stawianych mu wówczas zarzutów  wynika,
iż z chwilą powzięcia wiedzy odnośnie możliwości sprzedaży na kredyt usług
turystycznych i  obowiązujących w tym zakresie procedur, w zakresie których
przeszkolił go K██████ N████████, dokonał sprzedaży w systemie ratalnym
kilkudziesięciu wyjazdów wakacyjnych. Podejrzany zaprzeczył, aby świadomie
uczestniczył w przestępczym procederze. W chwili inicjowania procedury kredytowej
nie miał bowiem wiedzy, iż szereg osób, które za jego pośrednictwem zamierzało
zaciągnąć kredyty w Banku Zachodnim Spółka Akcyjna Oddział w Namysłowie tak
naprawdę od samego początku planowało przeznaczyć uzyskane środki finansowe na
cele inne niż oferowane przez Firmę Handlowo – Usługową Biuro Podróży PTTK
imprezy turystyczne. Jednocześnie podejrzany wyjaśnił, iż w przypadku rezygnacji
przez  kredytobiorców z wykupionych wczasów przekazywał im pieniądze tytułem
kredytu przyznanego na sfinansowanie konkretnego wyjazdu turystycznego na
polecenie K██████ N████████. Adam Antonowicz przyznał jednocześnie, iż
przekazywał kredytobiorcom kwotę przyznanego kredytu pomniejszoną o 10 procent
prowizji, jak również o jakąś nieokreśloną procentowo kwotę, którą określił jako tak
zwane „gorące pieniądze". Podejrzany zaprzeczył również, aby miał świadomość, iż
szereg dokumentów, którymi posłużyli się kredytobiorcy były nierzetelne bądź
sfałszowane.

Numer 38 - protokół przesłuchania Adama Antonowicza w charakterze podejrzanego z dnia 20 marca 2000 roku. Z wyjaśnień Adama Antonowicza, w toku których nie przyznał się on do popełnienia stawianych mu zarzutów i które w pełni korespondują z wyjaśnieniami złożonymi w dniu 11 maja 1999 roku podejrzany skorygował liczbę sprzedanych na kredyt usług turystycznych z kilkudziesięciu na kilkanaście przyznając, iż warunkiem przyznania kredytu było wykupienie usługi turystycznej.

Numer 39 - protokół przesłuchania Adama Antonowicza w charakterze podejrzanego z dnia 17 stycznia 2003 roku. Dowód ten wskazuje na fakt, iż podejrzany w dacie przesłuchania nie przyznał się do popełnienia żadnego ze stawianych mu wówczas czynów, zaprzeczając jednocześnie świadomemu uczestnictwu w przestępczym procederze. Z wyjaśnień podejrzanego wynika bowiem, iż każda z osób dokonujących zakupu w prowadzonym przez niego biurze podróży imprez turystycznych nie informowała go o zamiarze rezygnacji z wyjazdu niezwłocznie z chwilą przyznania kredytu w celu uzyskania wyłącznie środków finansowych. Adam Antonowicz wyjaśnił również, iż nie zawierał ani z Bankiem Zachodnim Spółka Akcyjna Oddział w Namysłowie, ani z firmą KLN Pośrednictwo Kredytowe K███████ N███████ żadnej umowy o współpracy w zakresie pośrednictwa kredytowego, ograniczając się wyłącznie do fizycznego przygotowania dokumentów stosownie do wytycznych udzielonych mu przez K███████ N███████.

Numer 40- protokół przesłuchania w charakterze podejrzanego A███████ D███ z dnia 7 sierpnia 2003 roku. Z wyjaśnień A███ D███, który w ramach niniejszego śledztwa pozostaje pod zrzutem popełnienia wspólnie i w porozumieniu z Adamem Antonowiczem przestępstw wyłudzenia kredytów zaciągniętych na nazwiska M███ K███████ oraz I███ B███████ wynika, iż nie przyznał się do popełnienia żadnego ze stawianych mu zarzutów a następnie skorzystał z przysługującego mu prawa do odmowy złożenia wyjaśnień.

Numer 41 - pisemna informacja kierownika Wydziału Konsularnego Ambasady Rzeczypospolitej Polskiej w Londynie z dnia 27 października 2009 roku. Z przedmiotowej informacji, która stanowi również zawiadomienie o przestępstwie

wynika, iż w dniu 28 września 2009 roku Adam Kazimierz Antonowicz w związku z upływem daty ważności paszportu serii BM numer 4589629 złożył w Ambasadzie Rzeczypospolitej Polskiej w Seulu wniosek o wydanie nowego paszportu. Z uwagi na fakt, iż wobec Adama Antonowicza postanowieniem Sądu Rejonowego w Opolu z dnia 22 kwietnia 2005 roku, sygnatura akt II Kp 105/05 zastosowano środek zapobiegawczy w postaci tymczasowego aresztowania, natomiast Prokurator Prokuratury Okręgowej w Opolu postanowieniem z dnia 16 lipca 2003 roku zastosował wobec niego środek zapobiegawczy w postaci zakazu opuszczania kraju połączony z zatrzymaniem paszportu odmówiono Adamowi Antonowiczowi wydania paszportu.

Z kolei w dniu 13 października 2009 roku J██ A██ A██████ złożył w Konsulacie Generalnym Rzeczypospolitej Polskiej w Sao Paulo wniosek o wydanie paszportu tymczasowego w związku z uszkodzeniem poprzedniego paszportu o serii AM i numerze 2316361 wydanym przez Wojewodę Opolskiego w dniu 16 stycznia 2006 roku. Konsul w Sao Paulo wydał wnioskodawcy paszport tymczasowy o serii PA i numerze 4183012 z terminem ważności od 16 października 2009 roku do dnia 16 czerwca 2010 roku.

Dysponując paszportem tymczasowym J██ A██ A██████ w dniu 20 października 2009 roku wystąpił z wnioskiem o wydanie nowego paszportu 10 - letniego w Wydziale Konsularnym Ambasady Rzeczypospolitej Polskiej w Londynie. Konsul w Londynie na podstawie dostępnego w bazie Centralnej Ewidencji Wydanych i Utraconych Paszportów zdjęcia J██ A██ A██████ z paszportu o serii AM i numerze ██361 oraz zdjęcia zamieszczonego w paszporcie o serii PA i numerze ██012 wydanym przez Konsula w Sao Paulo stwierdził, iż nie jest to wizerunek tej samej osoby. Ponadto stwierdził także inny wzór podpisu posiadacza paszportu. W związku z podejrzeniem popełnienia przestępstwa w dniu 20 października 2009 roku uzyskano z Urzędu Wojewódzkiego w Opolu kopie wniosków paszportowych J██ i Adama Antonowiczów ustalając, iż osobą, która podając się za J██ A██ Antonowicza złożyła wniosek w Konsulacie Generalnym Rzeczypospolitej Polskiej w Sao Paulo a następnie otrzymała paszport tymczasowy o serii PA i numerze ██012 ze swoim zdjęciem był Adam Kazimierz Antonowicz. Podobnie fałszywe dane Adam Kazimierz Antonowicz podał w dniu 20 października 2009 roku we wniosku o

wydanie paszportu 10 – letniego złożonym w Wydziale Konsularnym Ambasady Rzeczypospolitej Polskiej w Londynie.

Numer 42 – pisemne wyjaśnienia Konsula Generalnego w Sao Paulo z dnia 10 listopada 2009 roku. Z informacji nadesłanej przez Konsula Generalnego w Sao Paulo Jacka Sucha wynika, iż podający się za J███████ A████ A█████████ Adam Kazimierz Antonowicz stawił się w tamtejszym konsulacie w dniu 13 października 2009 roku, celem ubiegania się o wydanie nowego paszportu tymczasowego. W czasie rozmowy z wicekonsulem T████████ Ł██████ okazał rzekomo jedyny posiadany przez siebie dowód tożsamości w postaci zniszczonego paszportu serii AM numer ████361 na nazwisko brata J███████ A████ A█████████. Rzeczony dokument miał pociętą stronę ze zdjęciem oraz wyrwanych kilka dalszych kart. Konieczność pilnego wyrobienia nowego paszportu wnioskodawca uzasadnił potrzebą udania się do Wielkiej Brytanii, gdzie wówczas zamieszkiwał. Do wypełnionego wniosku paszportowego Adam Antonowicz załączył dwa własne zdjęcia. Z wyjaśnień Konsula Rzeczypospolitej Polskiej w Sao Paulo wynika także, iż z uwagi na fakt, iż strona zawierająca dane paszportowe ze zdjęciem była częściowa zniszczona, a nadto istniało wyraźne podobieństwo pomiędzy wnioskodawcą a właścicielem paszportu konsul przyjmujący wniosek nie miał podstaw do podejrzeń co do tożsamości osoby składającej wniosek. W związku z niemożnością elektronicznej weryfikacji danych osobowych obywatela w systemie paszportowym Ministerstwa Spraw Wewnętrznych i Administracji, konsul w dniu 15 października 2009 roku wysłał faks do Opolskiego Urzędu Wojewódzkiego z prośbą o potwierdzenie danych osobowych i paszportowych wnioskodawcy. W dniu następnym, z chwilą otrzymania z Opolskiego Urzędu Wojewódzkiego potwierdzenia danych personalnych wnioskodawcy oraz informacji o braku zastrzeżeń co do wydania paszportu, został Adamowi Antonowiczowi wydany paszport tymczasowy PA ████012, z datą ważności 16 czerwca 2010 roku na nazwisko J██████ A████ A█████. Do przedmiotowych wyjaśnień konsul załączył oryginały dokumentów, którymi posłużył się Adam Antonowicz, to jest uszkodzony paszport serii AM nr ████361 na nazwisko J█████ A████ A█████████, wniosek o wydanie paszportu tymczasowego, oświadczenie o zniszczeniu dokumentu paszportowego, oraz kopię faksu z Opolskiego Urzędu Wojewódzkiego z dnia 16 października 2009 rok, które z

uwagi na fakt podrobienia podpisów oraz podania nieprawdziwych danych personalnych uznane zostały za dowody rzeczowe.

Numer 43 - pisemna informacja Konsula Rzeczypospolitej Polskiej w Seulu z dnia 13 listopada 2009 roku. Z informacji tej wynika, iż Adam Antonowicz w dniu 28 września 2009 roku zgłosił się do placówki konsularnej w Seulu z wnioskiem o wydanie paszportu tymczasowego. W dniu następnym planował bowiem wyjechać do Chin, podczas gdy ważność jego paszportu serii BM numer ███629 była zbyt krótka. Z uwagi na uzyskanie z Opolskiego Urzędu Wojewódzkiego informacji w przedmiocie figurowania wnioskodawcy w rejestrze osób, którym nie wydaje się paszportu, odmówiono mu wydania paszportu tymczasowego sugerując powrót do kraju przed upływem terminu ważności aktualnego paszportu, który zakreślono na dzień 21 października 2009 roku.

Numer 44 - decyzja Wojewody Opolskiego z dnia 31 grudnia 2009 roku w przedmiocie unieważnienia paszportu serii PA numer ███012 wydanego w dniu 16 października 2009 roku przez Konsula Rzeczypospolitej Polskiej w Sao Paulo z terminem ważności do dnia 16 czerwca 2010 roku na nazwisko J████ A████ A█████████.

Numer 45 - protokół przesłuchania w charakterze świadka J████ A████ A█████████ z dnia 11 grudnia 2009 roku. Z zeznań tego świadka wynika, iż nie wie on w jaki sposób utracił paszport serii AM i numerze ███361, jak również w jakich okolicznościach oraz przez kogo dokument ten został zniszczony. Zaprzeczył również, aby ubiegał się o paszport tymczasowy w Konsulacie Rzeczypospolitej Polskiej w Sao Paulo jak również o paszport 10-letni w Ambasadzie Rzeczypospolitej Polskiej w Londynie.

Numer 46 - opinia biegłego z zakresu badania pisma ręcznego i dokumentów z dnia 25 lutego 2010 roku. Z niniejszej ekspertyzy jednoznacznie wynika, iż wszystkie zakwestionowane podpisy o treści „Antonowicz" złożone na wnioskach o uzyskanie paszportu tymczasowego oraz oświadczeniach o zniszczeniu paszportu złożonych

zarówno w Konsulacie Rzeczypospolitej Polskiej w Sao Paulo, jak również w Ambasadzie Rzeczypospolitej Polskiej w Londynie zostały nakreślone przez Adama Kazimierza Antonowicza.

Zarzucone Adamowi Kazimierzowi Antonowiczowi przestępstwa zagrożone są następującymi karami:
- czyn opisany w punkcie I karą pozbawienia wolności od 3 miesięcy do 5 lat
- czyn opisany w punkcie II karą grzywny, ograniczenia wolności albo pozbawienia wolności od 3 miesięcy do 5 lat,
- czyn opisany w punkcie III karą grzywny, ograniczenia wolności albo pozbawienia wolności od 3 miesięcy do 5 lat.

Termin przedawnienia przestępstw zarzucanych Adamowi Kazimierzowi Antonowiczowi przewidziany jest
- za czyn opisany w punkcie I postanowienia o przedstawieniu zarzutów na dzień 17 sierpnia 2018 roku
- za czyn opisany w punkcie II postanowienia o przedstawieniu zarzutów na dzień 16 października 2029 roku
- za czyn opisany w punkcie III postanowienia o przedstawieniu zarzutów na dzień 20 października 2029 roku.

Przedmiotowe śledztwo do tej pory nie zostało zakończone, albowiem nie wykonano wszystkich czynności procesowych z udziałem podejrzanego Adama Kazimierza Antonowicza, który przed organami ścigania ukrywa się od 2005 roku.

Zdołano natomiast zakończyć prawomocnymi wyrokami skazującymi przedmiotowe postępowanie karne wobec niemal wszystkich pozostałych współpodejrzanych. K█████ N█████ wyrokiem Sądu Okręgowego w Opolu z dnia 14 sierpnia 2009 roku o sygnaturze akt III K 163/06 skazany został na karę 2 lat pozbawienia wolności z warunkowym zawieszeniem jej wykonania na okres próby 4 lat. Z kolei I███ B█████ skazana została wyrokiem Sądu Rejonowego Brzegu z dnia 27 września 2002 roku, sygnatura akt II K258/01 na karę 1 roku pozbawienia wolności

z warunkowym zawieszeniem jej wykonania na okres próby 3 lat, natomiast M████ K████ i A██ R████████ wyrokami tegoż Sądu na kary 5 miesięcy pozbawienia wolności z warunkowym zawieszeniem jej wykonania na okres próby 2 lat.

Bez procesowego stanowiska Adama Antonowicza niemożliwe jest natomiast zakończenie postępowania wobec współpodejrzanych A███ D████ oraz K████ S███ z uwagi na konieczność przeprowadzenia konfrontacji pomiędzy tymi osobami.

Od dnia 4 maja 2005 roku Adam Kazimierz Antonowicz poszukiwany jest listem gończym.

Czynności poszukiwawcze w tej sprawie nie przyniosły pozytywnych efektów.

W toku czynności poszukiwawczych prowadzonych za Adamem Antonowiczem ustalono, iż podejrzany nie przebywa w miejscu swego stałego zamieszkania, jak również nie ujawniono innego jego miejsca pobytu w kraju.

Biorąc pod uwagę liczne informacje odnotowujące pobyt Adama Kazimierza Antonowicza w krajach Europy, Ameryki Północnej oraz Południowej oraz długotrwałość nieskutecznych poszukiwań na terenie kraju bezsporne jest to, że ukrywa się on poza granicami Państwa.

W oparciu o dokonane w przedmiotowej sprawie ustalenia, na wniosek Prokuratury Okręgowej w Opolu Sąd Rejonowy w Opolu postanowieniem z dnia 22 kwietnia 2005 roku, sygnatura akt II Kp 105/05 zastosował wobec Adama Antonowicza środek zapobiegawczy w postaci tymczasowego aresztowania na okres 7 dni od dnia zatrzymania. Z kolei postanowieniem tegoż Sądu z dnia 18 kwietnia 2012 roku, sygnatura akt II K p 125/12 zastosowano wobec tego podejrzanego zaoczny izolacyjny środek zapobiegawczy na okres 14 dni od dnia zatrzymania odnośnie wszystkich aktualnie stawianych Adamowi Antonowiczowi uzupełnionych zarzutów. Następnie za wyżej wymienionym rozesłano list gończy oraz wdrożono jego

międzynarodowe poszukiwania, z tym że faktycznie nieprzerwanie poszukiwany jest on od 2005 roku.

Pismem z dnia 20 lutego 2012 roku rozszerzono poszukiwania międzynarodowe Adama Antonowicza na teren Stanów Zjednoczonych Ameryki.

Tymczasowe aresztowanie podejrzanego i poszukiwanie go listem gończym zgodnie z treścią artykułu 258 i 279 kodeksu postępowania karnego może nastąpić miedzy innymi jeżeli ukrywa się on lub nie ma stałego miejsca pobytu w Polsce.

Obie te okoliczności zaistniały w przypadku podejrzanego Adama Antonowicza.

Z informacji pozyskanej przez Biuro Międzynarodowej Współpracy Policji Komendy Głównej Policji wynika, iż podejrzany Adam Kazimierz Antonowicz aktualnie przebywa na terytorium Stanów Zjednoczonych Ameryki Północnej, gdzie został zatrzymany do kontroli drogowej. Wylegitymowany przez tamtejszą Policję okazał unieważniony polski paszport oraz prawo jazdy wydane przez władze stanu California o numerze ███720, z którego wynika nadto, iż zamieszkuje on pod adresem███████████████ ORANGE CA 92866.

W związku z przedstawionymi powyżej okolicznościami wnoszę o tymczasowe aresztowanie i ekstradycję podejrzanego do Polski.

Ponadto zapewniam, że Adam Kazimierz Antonowicz nie zostanie pociągnięty bez zgody władz Stanów Zjednoczonych Ameryki Północnej do odpowiedzialności karnej za przestępstwa nie objęte niniejszym wnioskiem, jak również nie zostanie wydany władzom innego państwa.

Prokurator Okręgowy

*Włodzimierz Ostrowski*

Do wniosku załączam uwierzytelnione odpisy następujących dokumentów:

1.odpis ostatniego postanowienia Sądu Rejonowego w Opolu z dnia 18 kwietnia 2012 roku, sygnatura akt II Kp 125/12 o tymczasowym aresztowaniu Adama Antonowicza,

2.odpis ostatniego postanowienia Prokuratury Okręgowej w Opolu z dnia 23 kwietnia 2012 roku o poszukiwaniu podejrzanego listem gończym, oraz listu gończego,

3. kopie fotografii Adama Antonowicza,

4. kopie linii daktyloskopijnych Adama Antonowicza,

5.wyciąg z przepisów Kodeksu karnego, oraz przepisów Ustawy z dnia 12 października 1994 r. o ochronie obrotu gospodarczego i zmianie niektórych przepisów prawa karnego.

6. poświadczenie posiadania obywatelstwa polskiego przez Adama Antonowicza z dnia 11 czerwca 2012 roku.

